Patricia A. Patton ("the worker") appeals from a judgment denying her workers' compensation benefits for what, she claims, is an occupational disease that has rendered her permanently and totally disabled. We affirm.
The worker was employed in the thermal department of the Werner Company for 9 1/2 years, from 1987 to 1996. Her job was "thermalizing" aluminum window frames, a process that involves treating the windows with heated chemicals and then cutting the treated window frames. The worker alleged that during her employment she was exposed to chemicals known as "isocyanates," which, she says, caused her to develop occupational asthma. She submitted several material safety data sheets indicating that overexposure to isocyanates can result in breathing difficulties, but she presented no evidence indicating that she had been overexposed, or that the levels of the chemicals at Werner were above a safe or legal limit.
The worker testified that the odor of the chemicals at work caused her to shake, wheeze, gasp, and suffer such a shortness of breath that she felt as if she were choking. She testified that, after awhile, she became sensitive to other odors as well, even odors she encountered away from the workplace. Specifically, she said that if she smelled cigarette smoke, fireplace fumes, cologne, deodorant, household *Page 819 
cleaners, lotions, or soap, she would wheeze, gasp, and choke. As a result, she testified, she had little or no social life, and she was unable to conduct her daily affairs as she had before.
The worker consulted a number of physicians, including Dr. Daniel C. Harrison, the company doctor at Werner. Dr. Harrison ordered a chest X-ray; the X-ray indicated no abnormalities. In October 1996, Dr. Harrison's diagnosis was that the worker had "bronchoconstriction, [and] mild small airway disease which is attributable to inhalation of certain vapors on the job." He prescribed an inhaler and recommended that the worker change jobs at the plant. The worker transferred to another department at Werner but did not remain there "more than five minutes" because, she said, she had another "attack." Dr. Harrison referred the worker to Dr. Robert Grubbe and Dr. R. Patel. Those physicians gave the worker several pulmonary-function tests that were essentially "normal," revealing only a "mild small airway obstruction with partial reversibility after bronchodilator." The worker was also given a "methacholine-challenge" test, which is used to diagnose asthma, and the results of the test were negative. The worker saw Dr. Allan R. Goldstein of Pulmonary Associates of the Southeast in Birmingham; Dr. Goldstein concluded that she had a mild pulmonary-obstructive defect. His diagnosis was "asthma with broncospasm."
Dr. Andrew M. Brown, a board-certified otolaryngologist, testified by deposition that he had diagnosed the worker as suffering from "severe asthma" due to "prolonged exposures to chemicals such as isocyanates." Dr. Brown stated that he had formulated his diagnosis and opinions only from the history given him by the worker. He had performed no pulmonary-function or lung-capacity tests on the worker, and he did not have access to any of her other medical records. He acknowledged that, had he been aware of the worker's negative results on the methacholine-challenge test, he would have questioned the diagnosis of asthma.
Dr. Brian G. Forrester, a physician certified in occupational medicine, testified by deposition that the worker had been referred to him by her family physician. Dr. Forrester conducted pulmonary-function tests and a methacholine-challenge test on the worker. Based on the results of those tests, he concluded that her lung function was "completely normal" and that she did not "have asthma of any type, much less occupational asthma." Instead, he said, the worker's clinical history and physical examination were more consistent with an anxiety disorder. He explained:
 "Some people with certain anxiety disorders will almost develop a conditioned response where they will smell something that makes them nervous and then they will develop an anxiety-type reaction and that manifests as hyperventilation and they'll feel short of breath. . . . I felt very comfortable that she did not have an asthmatic condition; that her condition was primarily psychological in origin."
Dr. Forrester testified that he recommended to the worker that she seek psychiatric treatment but she rejected his suggestion.
Dr. Forrester stated that he "completely disagree[d] with Dr. Brown's entire line of diagnosis, his entire methods" and that he disagreed with Dr. Brown's conclusion that the worker's symptoms could be traced to her on-the-job exposure to chemicals. Dr. Forrester gave his opinion that Dr. Brown's field of practice, which Forrester called "clinical ecology," was not accepted and was, in fact, denounced by the medical profession. *Page 820 
The worker's medical records from Northeast Alabama Regional Medical Center, dating back to 1977, were admitted in evidence. An emergency-room note made on the worker's visit to the emergency room in 1977 indicates that the worker was admitted complaining of "breath gurgling in her chest, heart racing, . . . shortness of breath and dizziness." The treating physician diagnosed the worker as having "neurotic personality with hypochondriasis, conversion symptoms, and magical thinking."
Dr. Alan D. Blotcky, Ph.D., a licensed psychologist, testified for the worker at trial. He gave his opinion that she was suffering from major depression with borderline intellectual ability (she has an IQ of 73). He said that the worker's depressive disorder was mixed with some somatization, which, he explained, was the "tendency to deal with stress by developing somatic complaints like becoming preoccupied with one's health and physical functioning." Dr. Blotcky recommended that the worker "be involved in aggressive psychiatric treatment for a major depressive disorder."
 I.
The worker contends that the trial court erred in determining that she had failed to prove by a preponderance of the evidence that she suffers from occupational asthma as a result of her on-the-job exposure to what, she claims, were dangerous chemicals. We find it unnecessary to discuss this contention because of the trial court's finding that the worker had "failed to establish from a preponderance of the evidence that she suffers from asthma or occupational asthma." (Emphasis added.)
In effect, the trial court found that the worker failed to prove that she suffered from a disease at all, much less an occupational disease. It is axiomatic that, to be entitled to workers' compensation benefits, the worker must first prove that she suffers from a disease, and then must prove that the disease arose out of, and in the course of, her employment. See § 25-5-1(9), Ala. Code 1975 (stating that an injury "shall not include a disease in any form, except for an occupational disease or where it results naturally and unavoidably from [an] accident" arising out of, and in the course of, the employment); § 25-5-110(1), Ala. Code 1975 (defining an "occupational disease" as "[a] disease arising out of and in the course of employment . . . which is due to hazards in excess of those ordinarily incident to employment in general and is peculiar to the occupation in which the employee is engaged").
 "Under this statutory definition of `occupational disease' [in 25-5-110(1)], the plaintiff must establish both legal and medical causation." Ex parte Valdez, 636 So.2d 401, 406 (Ala. 1994) (Shores, J., concurring specially). If a worker has failed to establish the threshold fact that she suffers from a "disease," then it is obviously unnecessary for a court to decide whether she has proved the medical and legal causation incident to establishing that she suffers from an "occupational disease."
It is "settled that the trial court's findings on disputed evidence in a workers' compensation case are conclusive." Ex parte Ellenburg,627 So.2d 398, 399 (Ala. 1993). Section 25-5-81(e)(2), Ala. Code 1975, provides that if the Court of Civil Appeals is reviewing pure findings of fact, "the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." Here, the evidence as to whether the worker suffered from asthma was obviously in conflict. Dr. Brown and Dr. Goldstein had diagnosed the worker as having asthma, while Drs. Grubbe, Patel, and Forrester had not diagnosed her as suffering from asthma. The *Page 821 
trial court's finding, based on the opinions of at least three experts, was clearly supported by substantial evidence. Had the trial court made the opposite finding, however, it too would have been supported by substantial evidence.
 II.
The worker also argues that the trial court erred by taking judicial notice of matters that were not "adjudicatory facts" as that term is defined in Rule 201, Ala. R. Evid. Rule 201(b) states:
 "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."
At trial, the worker testified that her chemical sensitivity was so pronounced that "any kind of odor, anything at all [including cologne or deodorant] would trigger an [asthma] attack." The trial court's order states:
 "[T]his Court observed [the worker] in its courtroom on October 21, 1999, for several hours, and [the worker] did not give any indication that she was in distress or about to have a respiratory attack. She testified, however, that `if somebody in this building (the courthouse) had on cologne or deodorant today, then that would trigger an attack.' The Court takes judicial notice of the fact that the odds of numerous individuals in the courthouse wearing cologne or deodorant at the time in question are significant."
Despite the fact that the trial judge stated that he was taking "judicial notice" of the likelihood that some people in the courthouse on that day were wearing deodorant or cologne, we think that the trial judge was actually using a common-sense assumption based on everyday experience to help him make a credibility determination. "`In considering the weight to be given evidence, "courts and juries must use common sense, common reason, and common observation as well as a common knowledge of the usual acts of men and women under given circumstances".'" Ashurst v. State,462 So.2d 999, 1006 (Ala.Crim.App. 1984) (quoting German v. State,429 So.2d 1138, 1143 (Ala.Crim.App. 1982)). Cf. Alabama Pattern JuryInstructions — Civil Instruction, No. 1.07 ("You may take into consideration any matter which you would in your everyday affairs, in passing on the truthfulness . . . of the testimony. Weigh the testimony in light of your common observation and experience. . . .").
The judgment of the circuit court is affirmed.
AFFIRMED.
Yates, P.J., and Thompson, Pittman, and Murdock, JJ., concur.